Robert A. HAWKINS and Yvonne Hawkins, Appellants,

v.

Dr. Philip M. ROSENBLOOM, Appellee.

No. 1997–CA–002972–MR.

Court of Appeals of Kentucky.

Aug. 20, 1999.

Case Ordered Published by Supreme Court May 10, 2000.

Discretionary Review Denied by Supreme Court May 10, 2000.

Kenneth H. Baker James S. Scroghan Louisville, KY, for appellants.

Craig L. Johnson Scott P. Whonsetler Louisville, KY, for appellee.

BEFORE: EMBERTON, GUIDUGLI and MILLER, Judges.

## OPINION

GUIDUGLI, Judge.

This is an appeal by Robert A. Hawkins and Yvonne Hawkins (Hawkinses) from a judgment order, pursuant to a jury verdict

of the Jefferson Circuit Court, which entered judgment for the appellee, Philip Rosenbloom, M.D. (Dr. Rosenbloom), and assessed all costs against the Hawkinses. We affirm in part, reverse in part, and remand.

On January 28, 1994, Dr. Rosenbloom performed elective gallbladder surgery on Mr. Hawkins at Baptist East Hospital in Louisville, Kentucky. On January 11, 1994, prior to undergoing gallbladder surgery, Mr. Hawkins met with Dr. Rosenbloom to discuss the general risks of surgery. As a result of this meeting, Dr. Rosenbloom caused to be prepared an office note stating that the general risks of surgery were discussed with Mr. Hawkins. Furthermore, Mr. Hawkins signed an informed consent form that stated his physician discussed with him the general risks of surgery. To remove Mr. Hawkins' gallbladder, Dr. Rosenbloom used a procedure called laparoscopic cholecystectomy, whereby several small incisions are made in the surgical area, a laparoscope is inserted into one and the gallbladder is removed through the others. Laparascopic cholecystectomy is generally the preferred method of cholecystectomy (removal of gallbladder) as opposed to open cholecystectomy, whereby one's gallbladder is removed through a single standard incision.

Mr. Hawkins was scheduled for release from the hospital on January 30, 1994. However, Mrs. Hawkins discovered drainage around the laparoscopic incisions and the discharge was canceled. Thereafter, Dr. Rosenbloom performed exploratory surgery on Mr. Hawkins and discovered that a 1.5–cm perforation had been cut into Mr. Hawkins' bowel and that the bowel was leaking fecal material into Mr. Hawkins' abdomen. On February 4, 1994, Dr. Rosenbloom drained two abscesses due to infection caused by the leaking bowel. Mr. Hawkins remained in the hospital seventeen (17) days and thereafter was released with a full colostomy. On May 12, 1995, Mr. Hawkins underwent a fourth surgery to close the colostomy, which

proved unsuccessful. However, the colostomy closed on its own several months later. In April of 1997, Mr. Hawkins underwent a fifth surgery for repair of a double hernia that was related directly to his January 30, 1994, colostomy.

The Hawkinses sued Dr. Rosenbloom for lack of informed consent and negligence among other things. The case went to trial and resulted in a jury verdict in favor of Dr. Rosenbloom. The Hawkinses raise three issues on appeal. First, before the trial of this matter, the trial court granted Dr. Rosenbloom's motion in limine excluding any evidence regarding informed consent at trial. The trial court granted said motion because the Hawkinses did not have an expert witness to testify with regard to the standard of care that an ordinary and careful physician would follow in obtaining informed consent. Furthermore, the trial court refused to instruct the jury on the law of informed consent. Second, the trial court refused to allow the Hawkinses' attorney to play video excerpts of testimony at trial during closing arguments. Third, during the trial of this matter, the trial court allowed Dr. Rosenbloom's attorney to cross-examine the Hawkinses' expert witness, Dr. Marco Bonta (Dr. Bonta), with a notarized letter from another physician.

■ With regard to their first argument, the Hawkinses maintain that no expert testimony was needed to establish the standard of care for informed consent. The law of informed consent, KRS 304.40–320, states as follows:

In any action brought for treating, examining, or operating on a claimant wherein the claimant's informed consent is an element, the claimant's informed consent shall be deemed to have been given where:

(1) The action of the health care provider in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with the accepted standard of medical or dental practice among mem-

bers of the profession with similar training and experience; and

(2) A reasonable individual, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedure and medically or dentally acceptable alternative procedures or treatments and substantial risks and hazards inherent on the proposed treatment or procedures which are recognized among other health care providers who perform similar treatments or procedures;

(3) In an emergency situation where consent of the patient cannot reasonably be obtained before providing health care services, there is no requirement that a health care provider obtain a previous consent.

Part (2) deals specifically with what a reasonable person should be told before deemed to have been given informed consent. The Hawkinses' argument on this issue is two-fold. First, they argue that KRS 304.40–320 requires that a physician must meet the standard set out in both parts (1) and (2) of the statute for valid informed consent. Second, they argue that "the question of what a reasonable individual would understand does not require expert testimony." Therefore, they maintain, the trial court should have allowed them to present the issue of informed consent to the jury without expert testimony because Dr. Rosenbloom did not meet the standard set out under part (2) of the statute.

 An action based on lack of informed consent "is in reality one for negligence in failing to conform to a proper professional standard...." *Holton v. Pfingst,* Ky., 534 S.W.2d 786, 788 (1975). As in any medical malpractice case, the general rule is that expert testimony is required to negate informed consent. *Keel v. St. Elizabeth Medical Center,* Ky., 842 S.W.2d 860, 862 (1992). In *Keel,* the hospital administered a CT scan that involved injecting a contrast dye into the patient's system. The patient later developed thrombophlebitis at the site of the injection. The Supreme Court found that expert testimony was not required to establish informed consent in this case because the patient was given absolutely no information whatsoever regarding the risks and hazards of the procedure. *Id.* In holding that expert testimony was not needed to establish informed consent in this case, the Court stated:

> If we are to analogize consent actions to negligence actions, we must also acknowledge that a failure adequately to inform the patient need not be established by expert testimony where the failure is so apparent that layman may easily recognize it or infer it from evidence within the realm of common knowledge.

*Id.* (citations omitted). Thus, *Keel* is limited in its application to situations where no information is given to the patient regarding the risks and hazards of the procedure. However, in the case *sub judice,* we are not presented with the same or even similar circumstances as that in *Keel.* Mr. Hawkins met with Dr. Rosenbloom on January 11, 1994, to discuss the general risks of gallbladder surgery. During his deposition, Mr. Hawkins did not deny that Dr. Rosenbloom had discussed the general risks of gallbladder surgery with him but instead stated that "I don't remember that it happened." However, Mr. Hawkins signed an informed consent form that stated that his physician had discussed the general risks of gallbladder surgery with him. At trial, Mr. Hawkins testified that he signed the consent form but that he did not ask any questions or ask Dr. Rosenbloom to go over the form with him. Furthermore, as a result of the January 11, 1994, meeting, Dr. Rosenbloom caused to be prepared an office note stating that the general risks of surgery were discussed with Mr. Hawkins. Given these facts, we do not believe that any alleged failure on Dr. Rosenbloom's part was "so apparent that layman may easily recognize it or infer it from evidence within the realm of

common knowledge." Thus, the trial court did not abuse its discretion by refusing to allow the Hawkinses to present evidence to the jury regarding lack of informed consent without expert testimony.

Next, the Hawkinses argue that the trial court erred by refusing to allow the Hawkinses to play a videotape of portions of testimony at trial during closing arguments. This argument is without merit. The Hawkinses have not presented this Court with any authority requiring a trial judge to allow a party to play a videotape of trial testimony during closing arguments, and we have not discovered any such authority during our research. It is a well settled principle that matters pertaining to closing arguments lie within the discretion of the trial court. *Reed v. Craig*, Ky., 244 S.W.2d 733 (1951). We do not believe that the trial court abused its discretion by refusing to allow the Hawkinses to play the videotape of trial testimony during closing arguments.

Finally, the Hawkinses argue that the trial court's decision to allow Dr. Rosenbloom's attorney to cross-examine their expert witness, Dr. Bonta, with a notarized letter from Dr. E. Christopher Ellison (Dr. Ellison) was an abuse of discretion and constituted prejudicial error. We must first decide whether the trial court erred in allowing Dr. Rosenbloom's attorney to cross-examine Dr. Bonta with the letter. If the trial court did err, then we must decide whether such error was harmless or prejudicial to the Hawkinses' case.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Kentucky Rules of Evidence (KRE) 801(c). Hearsay is inadmissible during a trial except as provided by KRE or Supreme Court rules. KRE 802. Dr. Ellison's letter constituted hearsay. However, the trial court allowed Dr.

Ellison's letter to be read into evidence under a hearsay exception, KRE 803, which states:

> The following are not excluded by the hearsay rules, even though the declarant is available as a witness:
>
> . . .
>
> (18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in *published treatises, periodicals, or pamphlets* on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits. (emphasis added).

Dr. Ellison's notarized letter did not fall within one of the stated exceptions. It certainly did not constitute a published treatise, it did not appear in any journal, nor was it published as a pamphlet. Instead, the letter contained written responses to questions posed to Dr. Ellison by Dr. Rosenbloom's counsel or presumably from someone on his behalf.[1] We do not know what material was provided to Dr. Ellison with regard to this case nor do we know exactly what questions were asked of him that caused the genesis of this letter. Further, we do not know the basis for his opinions. Dr. Rosenbloom had not listed him as a witness or, more specifically, an expert witness, and he had not been deposed for the case. He was not present at trial, did not testify, and the contents of the letter were never subject to cross-examination. In fact, Dr. Rosenbloom's counsel did not reveal the existence of this letter nor produce it to the Hawkinses' counsel until he sought the trial court's permission to use the letter to impeach Dr. Bonta at trial.

---

1. The letter is addressed to Gayle E. Arnold of the law firm Jacobson, Maynard, Tuschman & Kalur. We are not aware of who Ms. Arnold is or whom she may represent in this case.

This letter does not qualify as a "learned treatise" and the trial court erred by allowing Dr. Rosenbloom's counsel to question Dr. Bonta concerning its contents. Dr. Rosenbloom argues that any error in the trial court's ruling regarding use of the letter was "harmless error and does not rise to the level of being reversible." We disagree. The Supreme Court, in *Crane v. Commonwealth,* Ky., 726 S.W.2d 302, 307 (1987), recently articulated the test for harmless error:

> The test for harmless error is whether there is any reasonable possibility that absent error the verdict would have been different.... The question here is not whether the jury reached the right result regardless of the error, but whether there is a reasonable possibility that the error might have affected the jury's decision.

We believe it is reasonably possible that cross-examination of Dr. Bonta with the letter from Dr. Ellison affected the jury's decision. Essentially, Dr. Ellison was allowed to testify without Dr. Rosenbloom's counsel listing him as an expert witness or providing Civil Rule 26 disclosure. More important, however, is that the trial court allowed Dr. Ellison to testify in court without being subject to cross-examination by the Hawkinses' counsel. This allowed Dr. Rosenbloom to "pick and choose" amongst statements and opinions of Dr. Ellison knowing that Dr. Ellison would not be subjected to cross-examination with regard to those statements and opinions. In essence, the jury heard only one side of the story: the side most critical of the Hawkinses' case.

In fact, Dr. Ellison's "testimony" involved one of the central issues of the case: the standard of care employed by Dr. Rosenbloom in performing the surgery in question. Dr. Rosenbloom's counsel used Dr. Ellison's "testimony" to undermine and impeach the credibility of the Hawkinses' expert witness. Moreover, Dr. Rosenbloom's counsel emphasized the letter in closing arguments compounding the prejudicial effect of the hearsay testimony, all to the Hawkinses' detriment. We believe that use of the letter to cross-examine Dr. Bonta and in closing arguments constituted prejudicial error.

Accordingly, we affirm in part, reverse in part, and remand this case for proceedings consistent with this opinion.

ALL CONCUR.